**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Mark P. MALENFANT, Thomas C. Payne, and Payne Financial Group, Defendants.**

**No. 91 CIV. 2966 (MBM).**

United States District Court, S.D. New York.

March 12, 1992.

Bruce M. Bettigole, Margarita S. Brose, S.E.C., Washington, D.C., for plaintiff.

Allan M. Lerner, Lerner & Pearce, Fort Lauderdale, Fla., for Payne defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

The Securities and Exchange Commission brought this action against defendants Thomas C. Payne, Payne Financial Group and Mark P. Malenfant, alleging that they have manipulated the price of Texscan common stock, or were about to do so, in violation of Sections 9(a)(1), 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78i(a)(1), 78i(a)(2) and 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. Defendants have been preliminarily enjoined from violating the above sections of the Exchange Act; from destroying any relevant documents; and from disposing of any Texscan stock or sales proceeds therefrom.

The defendants Payne and Payne Financial Group move to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to Fed. R.Civ.P. 12(b)(6). For the reasons set forth below, defendants' motion is denied.

### I.

The facts as alleged in the complaint are as follows; Malenfant is a stockbroker with a securities firm registered with the Commission. Payne is president of Payne Financial Group, a public relations firm. The complaint alleges that defendants Malenfant, Payne and Payne Financial Group engaged in a scheme to defraud public investors in Texscan common stock. Texscan is a Delaware corporation that manufactures cable television products and is traded on the American Stock Exchange.

In March 1991, defendant Malenfant contacted Talton R. Embry, a director of Texscan and a principal of Magten Asset Management Corporation, an investment advisor. Complaint ¶ 15. Malenfant discussed with Embry his desire to purchase all the Texscan common stock owned by Magten's clients, which at the time was approximately 35 percent of the outstanding stock of Texscan. Complaint ¶¶ 12, 15. During the week of April 15, 1991, employees of Payne Financial Group began ag-

gressively to promote the purchase of Texscan common stock. Complaint ¶¶ 23, 25. These employees told stockbrokers that, among other things, Texscan stock would be trading at between $12 and $20 per share very shortly. Complaint ¶ 25. The employees did not disclose that Payne, Payne Financial Group or others were conducting an unlawful scheme to manipulate the price of Texscan common stock upwards. *Id.*

On April 16, 1991, defendant Payne contacted Embry and identified himself as a customer of defendant Malenfant. Complaint ¶ 16. In that conversation Payne told Embry that he and his employees "controlled" over 300 retail stockbrokers through his company, Payne Financial Group. *Id.* Payne told Embry that he could arrange for the sale of Magten's customer holdings of Texscan common stock at increasing prices which would drive the price of Texscan common stock to between $9 and $10 per share. *Id.* The price of Texscan common stock at the close of the market on April 15, 1991 was $5.125 per share. *Id.* Payne further proposed to Embry that Magten sell 150,000 share blocks in lots of 10,000 shares at prices increasing by 12.5 cents or 25 cents until the price reached $10. Complaint ¶ 17. Finally, Payne told Embry that he wanted an option to purchase 150,000 shares of Texscan common stock from Magten customer accounts at $6 per share, and that he would exercise the option at some point after the stock reached $12 to $15. Complaint ¶ 18.

On April 18, 1991, Malenfant told Embry he was working with Payne, and that Malenfant would place the orders to sell Texscan common stock in Magten customer accounts and that Payne would place matching buy orders. Complaint ¶ 19. Malenfant repeated Payne's earlier representations to Embry that blocks of Texscan stock would be sold at increasing price increments. *Id.* Malenfant also told Embry that he and Payne already owned Texscan common stock. Complaint ¶ 20.

The manipulative scheme resulted in artificial increases in the volume and price of Texscan common stock beginning on April 16, 1991. Complaint ¶ 26. The following chart lists the closing prices of Texscan common stock and the volume traded for the period April 8, 1991 through April 19, 1991, the last day on which the stock was traded before the trading suspension ordered by the Commission:

| DATE | CLOSING PRICE | VOLUME |
|------|---------------|--------|
| 4/8 | 5.875 | 18,600 |
| 4/9 | 6 | 7,700 |
| 4/10 | 5.625 | 4,300 |
| 4/11 | 6 | 5,000 |
| 4/12 | 5.625 | 4,200 |
| Weekend—Market closed | | |
| 4/15 | 5.125 | 7,000 |
| 4/16 | 5.75 | 37,100 |
| 4/17 | 7.25 | 70,800 |
| 4/18 | 7.75 | 73,600 |
| 4/19 | 8 | 71,200 |

Complaint ¶ 27. Thirty thousand shares of Texscan common stock were traded in the last half hour of trading on April 19, 1991. Complaint ¶ 28. Texscan made no major corporate announcements which might have caused the unusual volume and price increases. Complaint ¶ 29. The Commission suspended trading in Texscan stock on April 22, 1991, before any of Magten's customers' positions in Texscan stock could be sold as part of the scheme. Complaint ¶ 21. While trading in the Texscan common stock remained suspended, Payne and Malenfant indicated to Embry that they intended to continue with their plan to drive up the price of Texscan stock after the suspension was lifted. Complaint ¶ 22.

Payne and Payne Financial Group make three arguments for dismissal. The first is that the complaint fails to allege that Payne possessed the requisite knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price had been or would be entered on the reverse side of the transaction. The second is that since Embry did not sell Magten customers' positions in Texscan common stock before trading in the security was suspended by the Commission on April 22, 1991, no agreement to match orders could have existed between Embry and Payne or Payne Financial Group, and therefore no violation

could have occurred. Finally, defendants argue that their campaign of telephone calls to stockbrokers, aggressively promoting the purchase of Texscan stock, is common practice in the securities industry, and therefore cannot be a violation of § 9(a)(2) of the Exchange Act.

## II.

Under Fed.R.Civ.P. 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) (footnote omitted). In addition, "[when] deciding a motion to dismiss, the Court must accept the plaintiff's allegation of facts as true together with such reasonable inferences as may be drawn in its favor." *Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608, 615 (S.D.N.Y.1990) (*citing Murray v. City of Milford,* 380 F.2d 468, 470 (2d Cir.1967)).

Subsections 9(a)(1) and (2) provide:

(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

(1) For the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance .with respect to the market for any such security,
. . .

(B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or

(C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security or raising or depressing the price of such securities, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(1) and (2).

In order "[t]o make out a violation of subsection 9(a)(1) ..., a plaintiff must prove the existence of (1) a wash sale or matched orders in a security[,] (2) done with scienter [and] (3) for the purpose of creating a false or misleading appearance of active trading in that security ..." *Chemetron Corp. v. Business Funds, Inc.,* 682 F.2d 1149, 1163 (5th Cir.1982) (footnotes omitted). To make out a subsection 9(a)(2) claim, the plaintiff must show "(1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others ..." *Id.* at 1164 (footnotes omitted); *See also Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787 (2d Cir.1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); *Baum v. Phillips, Appel & Walden, Inc.,* 648 F.Supp. 1518 (S.D.N.Y.1986). "The central purpose of section 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price." *Trane Co. v. O'Connor Securities,* 561 F.Supp. 301, 304 (S.D.N.Y.1983) *citing Chris–Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 383 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

■ The Commission has alleged that these defendants developed a scheme to increase artificially the price of Texscan common stock by matching the buy orders to be made by defendants Payne and Payne Financial Group, with the sell orders to be made by defendant Malenfant. A reasonable inference can be drawn from these allegations that the defendants knew what they were doing and were acting intentionally. The complaint further alleges that the purpose of this scheme was to create a misleading appearance of active trading in the Texscan common stock, so as to induce innocent investors to purchase Texscan stock and thus bid up the price of such stock. The complaint specifically alleges that the defendants acted with intent to manipulate the market in Texscan common stock. Thus, the complaint properly alleges violations of subsections 9(a)(1) and (2).

It was not necessary for the matched buy and sell orders to have been executed. Under § 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), the Commission is empowered to obtain injunctive relief whenever a person is about to violate the securities laws. Section 21(d) of the Exchange Act states the following:

"(1) Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, the rules of a national securities exchange or registered securities association of which such person is a member or a person associated with a member, ... it may in its discretion bring an action in the proper district court of the United States, ... to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond...."

15 U.S.C. § 78u(d)(1).

Failure by plaintiff to allege that the matched orders were executed prior to suspension of trading in Texscan common stock, is not dispositive of whether the defendants violated the securities laws. Therefore, the plaintiff has stated a claim under subsections 9(a)(1) and (2) of the Exchange Act.

■ Section 10(b) is the general anti-fraud provision of the Exchange Act, and it prohibits any person from using or employing "any manipulative or deceptive device" in connection with the sale of a security. In order to state a claim under section 10(b) and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, a plaintiff "must allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security." *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 581 (2d Cir.1990) *citing Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

■ The complaint alleges that Payne and Payne Financial Group engaged in or were about to engage in a manipulative scheme to match buy and sell orders of Texscan common stock. "The natural consequence of this course of conduct was to artificially stimulate the so-called market price of the stock while making it appear to be the product of the independent forces of supply and demand when, in reality, it was completely a creature of defendants' subterfuge." *Securities and Exchange Comm'n v. Resch–Cassin & Co.*, 362 F.Supp. 964, 978 (S.D.N.Y.1973). The complaint alleges further that the defendants omitted or were about to omit material facts in statements they made or were going to make to their customers. The defendants purchased or were about to purchase Texscan stock for their customers, and in so doing, failed to disclose their manipulative scheme. Assuming these allegations to be true, the plaintiff has stated a valid claim under § 10(b).

For the reasons set forth above, defendants' motion to dismiss is denied.

SO ORDERED.