*Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## <u>SUMMARY ORDER</u>

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 10th day of June, two thousand twenty-four.

PRESENT:

> DENNY CHIN,
> RICHARD J. SULLIVAN,
> MYRNA PÉREZ,
> *Circuit Judges.*

_____

MASO CAPITAL INVESTMENTS LIMITED, ALTIMEO ASSET MANAGEMENT, BLACKWELL PARTNERS LLC SERIES A, CROWN MANAGED ACCOUNTS SPC for and on behalf of CROWN/MASO SEGREGATED PORTFOLIO, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants*,

v.                                                          No. 22-355

E-HOUSE (CHINA) HOLDINGS LIMITED, XIN ZHOU, NEIL NANPENG SHEN, E-HOUSE HOLDINGS LTD., BING XIANG, HONGCHAO ZHU, JEFFREY ZENG, WINSTON LI, DAVID JIAN SUN, CANHAO HUANG, SINA CORPORATION, KANRICH HOLDINGS LIMITED, ON CHANCE, INC.,

SMART CREATE GROUP LIMITED, SMART MASTER INTERNATIONAL LIMITED, JUN HENG INVESTMENT LIMITED, CHARLES CHAO,

*Defendants-Appellees.*

| | |
|---|---|
| **For Plaintiffs-Appellants:** | CAROL C. VILLEGAS, Labaton Sucharow LLP, New York, NY (Jake Bissell-Linsk, Labaton Sucharow LLP, New York, NY, Jeremy A. Lieberman, Michael Grunfeld, Pomerantz LLP, New York, NY, *on the brief*). |
| **For Defendants-Appellees:** | BRADLEY A. KLEIN, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, DC (Scott D. Musoff, Robert A. Fumerton, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, *on the brief*). |

Appeal from a judgment of the United States District Court for the Southern District of New York (Edgardo Ramos, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the February 8, 2022 judgment of the district court is **AFFIRMED**.

Maso Capital Investments Limited, Blackwell Partners LLC – Series A, Crown Managed Accounts SPC, and Altimeo Asset Management (collectively, the "Investors") appeal from a judgment dismissing their Amended Complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure against E-House (China) Holdings Limited ("E-House" or the "Company"), its former executives and board members, and various individuals and entities that purchased the Company through a go-private merger (the "Buyer Group"). In this putative securities-fraud class action, the Investors allege that, between July 1 and August 31, 2016, the Defendants made a series of false and misleading statements in violation of sections 10(b), 13(e), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). We assume the parties' familiarity with the underlying facts, the procedural history, and the issues on appeal, to which we refer only as necessary to explain our decision to affirm.

## I. Background

E-House is a real-estate services company based in China that, during the relevant period, listed American Depository Shares ("ADS") on the New York Stock Exchange. On June 9, 2015, E-House received a proposed buyout offer of $7.38 per ADS from the Buyer Group, which eventually consisted of: (1) Xin Zhou, a co-founder of E-House and the co-chair of its board of directors (the "E-House Board"); (2) Neil Nanpeng Shen, an E-House board member; (3) Charles Chao, the co-chair of the E-House Board; (4) Sina Corporation, for which Chao served as

3

Chief Executive Officer; and (5) other companies owned by Zhou or Shen, *i.e.*, Kanrich Holdings Limited, On Chance, Inc., Smart Create Group Limited, Smart Master International Limited, and Jun Heng Investment Limited. That same day, E-House formed a transaction committee (the "Transaction Committee") comprised of E-House board members who did *not* belong to the Buyer Group – namely, Bing Xiang, Hongchao Zhu, Jeffrey Zhijie Zeng, Winston Li, and David Jian Sun – to evaluate the buyout offer.[1] After retaining separate legal counsel and financial advisors, the Transaction Committee began negotiations with the Buyer Group, which involved several counteroffers regarding proposed prices.

On April 14, 2016, the Transaction Committee and E-House Board approved the proposed management buyout at a merger price of $6.85 per ADS, a 9.08% premium on E-House's share price at the time. To solicit shareholder votes, E-House published preliminary, amended, and final proxies between April and July 2016, which set forth, among other things, the structure and terms of the deal, the investors' appraisal rights, management's projections for the Company as of January 2016 (the "Management Projections"), and the reasons for the merger. On

---

[1] On June 12, 2015, Sun withdrew from the Transaction Committee due to potential conflicts.

August 5, 2016, E-House announced that its shareholders had voted in favor of the merger. The merger closed seven days later, at which time the Company had a valuation of $1.06 billion.

On October 14, 2016, a dissenting shareholder filed a petition in the Grand Court of the Cayman Islands to exercise its appraisal rights. The parties commenced an appraisal hearing on April 10, 2018. During this hearing, counsel to the dissenting shareholder argued that another set of projections (the "Parallel Projections") – which were purportedly "approved" by Zhou in "June 2016" and audited by an accounting firm – showed higher profit figures, sales figures, earnings before interest and taxes, and consolidated annual growth rates than those disclosed in the Management Projections. J. App'x at 47–49 ¶¶ 103–07. The parties to this Cayman appraisal action settled on April 12, 2018.

On July 1, 2018, E-House registered its shares for listing on the Hong Kong Stock Exchange (the "HKSE"). E-House's initial public offering on the HKSE took place on July 20, 2018, with the Company "ha[ving] a market capitalization of $2.651 billion." *Id.* at 53 ¶ 120.

The Investors brought this putative class action on April 9, 2020, alleging that E-House's proxy materials contained various false and misleading statements

attributable to the Company, its corporate officers, and the Buyer Group. The district court granted the Defendants' motion to dismiss, holding, in principal part, that the Amended Complaint failed to plead any actionable misstatement or omission. The Investors timely appealed.

## II.    Standard of Review

We review *de novo* the district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Generally, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In reviewing a motion to dismiss, we "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A complaint alleging securities fraud, however, must satisfy the heightened pleading standards imposed by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021). Thus, to "state with particularity the circumstances constituting fraud" as required by Rule 9(b), a "plaintiff must[:]  (1) specify the

6

statements that . . . were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation marks omitted). Likewise, the PSLRA requires, among other things, that the complaint "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

### III. Discussion

The Investors primarily assert that the Defendants made various material misrepresentations and omissions in violation of section 10(b) and its implementing rule, Securities and Exchange Commission Rule 10b–5. To state a claim under section 10(b) and Rule 10b–5, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). For the reasons explained below, we hold that the Investors have failed to sufficiently allege that any of the challenged statements are materially false or

7

misleading. Finding this first element missing, we need not reach the merits of the remaining elements of the Investors' section 10(b) and Rule 10b–5 claims.

To establish liability under Rule 10b–5(b), there must be: (1) a false statement, *i.e.*, "an actual *statement*" that is "untrue outright," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (internal quotation marks omitted), or (2) a half-truth, *i.e.*, a "representation[] that state[s] the truth only so far as it goes, while omitting critical qualifying information," *id.* at 240 (quoting *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 188 (2016)). Notably, section 10(b) and Rule 10b–5(b) "do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Rather, "[d]isclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (quoting 17 C.F.R. § 240.10b–5(b)).

## A.      Statements Regarding the Company's Projections

The Investors first contend that the Management Projections contained in the last amended July 1, 2016 proxy (the "Final Proxy") did not reflect management's "best currently available estimates and judgments" because they had been "supplanted by newer projections," *i.e.*, the Parallel Projections, that E-

House withheld from investors. Invs. Br. at 18–27; *see, e.g.*, J. App'x at 59–60

¶¶ 140–44. We disagree.

Where, as here, the challenged statement is a projection relating to a company's future performance, it is considered an opinion and not a statement of fact. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110–12 (2d Cir. 2011), *abrogated on other grounds by Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015). Accordingly, the projection is misleading only if the speaker (1) "did not hold the belief [that was] professed," (2) "supplied" "supporting fact[s]" that "were untrue," or (3) "omit[ted] information whose omission ma[de] the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (internal quotation marks omitted). Projections are "not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189. Similarly, "[d]isclosure of an item of information is not required . . . simply because it may be relevant or of interest to a reasonable investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). That is because "[r]easonable investors understand that [projections] sometimes rest on a weighing of competing facts" and "do[] not expect that *every* fact known to an issuer supports its [projections]." *Omnicare*, 575 U.S. at 189–90.

Importantly, the "bespeaks caution" doctrine instructs that for forward-looking statements, we must credit cautionary language and consider the context in which alleged misstatements or omissions are made "to determine whether a reasonable investor would have been misled." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002). Under this doctrine, "[c]ertain alleged misrepresentations . . . are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language." *Id.* That said, cautionary language that "d[oes] not expressly warn of or d[oes] not directly relate to the risk that brought about plaintiffs' loss" is not sufficient. *Id.* at 359.

Here, the Amended Complaint alleges cursory facts suggesting that the Parallel Projections were "approved" by Zhou before July 2016 and that they "replaced" the Management Projections. Invs. Br. at 20–21 (citing J. App'x at 47–49 ¶¶ 104–07). But the Amended Complaint provides no details as to who created the Parallel Projections, for what purpose they were prepared, and to whom they were made available. *See, e.g.*, J. App'x at 24 ¶ 13 (alleging in conclusory fashion that the Parallel Projections were "prepared" by "E-House's management"); *id.* at 47–48 ¶ 104 (providing no facts as to who created the Parallel Projections).

10

Glaringly absent from the Amended Complaint are any particularized facts suggesting that the Parallel Projections were even created by or shared with the Company, its Board, or the Transaction Committee prior to the date of the Final Proxy. *See id.* Because the Amended Complaint "does not contain the requisite 'detail as to the who, what, when, where, and how' of the [P]arallel [P]rojections," Sp. App'x at 25 (quoting *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803–04 (S.D.N.Y. 2020)), we have no trouble concluding that the Investors failed to adequately plead that the Defendants did not believe that the Management Projections were accurate at the time they were published, that they disclosed any untrue facts, or that they concealed information that made such projections misleading, *see Tongue*, 816 F.3d at 210.

Moreover, the Final Proxy expressly stated that the Management Projections were "prepared by [E-House's] management in January 2016" and "d[id] not take into account *any circumstances or events occurring after the date that they were prepared*." J. App'x at 157 (emphasis added). It further provided that these projections "were based on numerous assumptions and estimates as to future events made by [E-House's] management that [E-House's] management believed were reasonable *at the time the projections were prepared*." *Id.* (emphasis added).

11

And in bold print and capital letters, the proxy statement warned that

**"THE COMPANY UNDERT[OOK] NO OBLIGATIONS TO UPDATE, OR PUBLICLY DISCLOSE ANY UPDATE TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS . . . THAT [WOULD] OCCUR AFTER THE PREPARATION OF THESE PROJECTIONS."**

*Id.* at 162. In light of these warnings, it is difficult to conceive how a "reasonable investor" could have been "misled about the nature [of] and risk" entailed in the Management Projections. *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 96 (2d Cir. 2004). "When read in their entirety," as they must be, "these [disclaimers] not only bespeak caution, they shout it from the rooftops, so to speak." *Halperin*, 295 F.3d at 360.[2]

The Investors alternatively argue that – under a pure-omission theory – the Defendants had an independent duty to disclose the Parallel Projections. To be sure, this Court once held that a duty to disclose, including duties that "derive from statutes or regulations that obligate a party to speak," could "serve as the

---

[2] In concluding that the Investors failed to allege any misrepresentations here, the district court also invoked the PSLRA's safe harbor for forward-looking statements. We reject that analysis, for the simple reason that go-private mergers are expressly excluded under that statute. *See* 15 U.S.C. § 78u-5(b)(1)(E) (listing as an exclusion from the safe harbor "forward-looking statement[s] in connection with a going private transaction").

basis for a securities fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101–02 (2d Cir. 2015). But the Supreme Court has since clarified that "[e]ven a duty to disclose . . . does not automatically render silence misleading under Rule 10b–5(b)." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 265 (2024). To the contrary, "Rule 10b–5(b) does not proscribe pure omissions," but instead "covers half-truths" by "requir[ing] disclosure of information necessary to ensure that statements already made are clear and complete." *Id.* at 264. The Investors' pure-omission arguments therefore fail because "[p]ure omissions" are no longer "actionable under Rule 10b–5," *id.* at 266, and there can be no "liability for failure to speak on a subject at all," *id.* at 264.

## B. Statements Regarding the Company's Subsequent Plans

The Investors next challenge a swath of statements from E-House's proxies disclaiming that the Buyer Group had "any present plans or proposals" relating to "an extraordinary corporate transaction," a "sale or transfer of a material amount of assets," or "any other material changes in the Company's business." *E.g.*, J. App'x at 56 ¶ 130. According to the Investors, the Buyer Group had, at this time, already formulated plans to relist E-House on the HKSE, rendering false and misleading these and other similar statements in the Final Proxy regarding the

13

Buyer Group's purpose for the merger.[3]  *See* Invs. Br. at 32–37 (citing, *inter alia*, *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145 (2d Cir. 2021)); *see also* J. App'x at 55–59 ¶¶ 129–39.  In support of this theory, the Investors make much of a July 2016 presentation that E-House and the Buyer Group gave to potential private investors, J. App'x at 49 ¶¶ 108–09; an "investment agreement" through which private investors purchased equity in the Company in August and September 2016, *id.* at 50 ¶ 113; and a Beijing Commercial Daily article published eighteen months after the merger that stated that "an individual close to the Company explained that after . . . the delisting, E-House introduced a number of new investors and made other changes in order to start the relisting," *id.* at 51 ¶ 116.  The Investors also allege that "[b]etween December 2016 and January 2017," the Buyer Group "brought in strategic investors and started the [initial public offering] preparation[s]." *Id*.

But virtually all this evidence relates to *post-merger* pitches to private investors and thus cannot demonstrate that the Defendants had a "concrete plan"

---

[3] In contrast to statements relating to E-House's projections, these subsequent transaction statements "involv[e] present or historical fact" and thus do not implicate the "bespeaks caution" doctrine. *P. Stolz*, 355 F.3d at 97–98 (internal quotation marks omitted).

14

to relist or materially alter the Company *at the time the proxy materials were shared with investors*. *Cf. Qihoo*, 19 F.4th at 150–51.[4] Indeed, allegations regarding the Buyer Group's talks with private investors *after* the go-private merger are consistent with the stated purpose of the transaction – namely, to gain "greater flexibility" "as a privately held company" to pursue "long-term profitability." J. App'x at 57 ¶ 134. And the Final Proxy explicitly disclosed that the Buyer Group "may propose or develop plans and proposals" in the future, "including the possibility of relisting the Company or a substantial part of its business on another stock exchange." *Id.* at 187. The Amended Complaint's conclusory allegation that the Buyer Group made a single presentation to potential private investors a few weeks before the merger closed "to take . . . parts of [the Company] and form a new business" with "a future stock listing in Asia," *id.* at 49 ¶¶ 108–09, is not enough to establish that the Defendants had sufficiently concrete plans to relist

---

[4] Unlike the complaint in *Qihoo*, the Investors here allege no facts concerning the mechanics of the Company's relisting and no information concerning the amount of time needed to effectuate such a relisting. *Cf. Qihoo,* 19 F.4th at 150–51. And while the *Qihoo* plaintiffs cited two news articles predating the defendant company's go-private merger that reported that the buyer group had a relisting plan, *see id.* at 150, the news article cited by the Investors here was published eighteen months after the merger and included no such similar report of pre-merger relisting plans.

E-House on the HKSE or make material changes to the Company when it issued its proxy statements, *cf. Qihoo*, 19 F.4th at 150–51.

## C. Statements Regarding the Fairness of the Merger

The Investors press on to argue that other statements from the Final Proxy – *i.e.*, that the Buyer Group and E-House Board believed that the 2016 merger was fair – were false and misleading because the Buyer Group and E-House Board had knowledge of the Parallel Projections and had already planned, at the time, to deprive investors of the Company's "much higher value." Invs. Br. at 39–44; *see* J. App'x at 54–55 ¶¶ 124–28. Because the Investors' arguments are simply repackaged versions of their challenges to the statements concerning the Management Projections and subsequent transactions, we reject them for the reasons discussed above.[5]

---

[5] The Investors likewise failed to state a claim for scheme liability under Rule 10b–5(a) and (c). For starters, the Amended Complaint does not clearly identify any deceptive acts distinct from the alleged (inactionable) misstatements and omissions. *See SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022) ("[M]isstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections." (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005))). Moreover, the Investors fail to specify, as they must under Rule 9(b), "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (internal quotation marks omitted).

### D.     Control-Person Liability

Finally, we address the Investors' claim that E-House and each member of the Buyer Group are liable under section 20(a) because they controlled the alleged section 10(b) violators.  Section 20(a) of the Exchange Act imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation [promulgated] thereunder."  15 U.S.C. § 78t(a).  But because we affirm the district court's dismissal of the Investors' claims under section 10(b) and Rule 10b–5, we also affirm the dismissal of their claims under section 20(a).  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).[6]

\*          \*          \*

We have considered the Investors' remaining arguments and find them to be without merit.  Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

---

[6] For similar reasons, we affirm the district court's dismissal of the Investors' claims under section 20A, *see Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703–04 (2d Cir. 1994), and section 13(e).